2016 2417. Yes, your honor. Thank you. The clock has not restarted. Thank you. I'd like to kind of refocus the argument here. As you say, I'm not trying to be repetitive. What the Alice inquiry gets into is, do you have an abstract idea? And if you do, you have to have something more. And I know there's disputes in the cases that talk about is this something more? Is it inventive? Is that a 102-103 analysis? Certainly if it is, in this case, because of what happened in the first case, I submitted a declaration of an expert explaining the improvements in the technology to the district court. So we did that. We went through in the complaint and did a 102-103 analysis. Because at the time, we weren't sure what this inventive concept means. I think if you go back and you look at mail, what the Supreme Court said was, if you have an abstract idea, doing it on a generic computer because of its ubiquity isn't enough to make it eligible. And in the Ultramershal case, when it went back up, it was reversed. And then the second time, when the holding of this court was, yes, it's an abstract idea. You do it on the Internet. Again, because, and the basis for that, and the Supreme Court denied certiorari, the basis for that is, are you trying to claim the abstract idea? I would analogize it this way. Even if generic computers weren't in the prior art, if the only way to practice the abstract idea is on a computer, you're essentially giving a monopoly, I'm sorry, you're preempting the use of the abstract idea. That's the only way I can reconcile those cases. So whatever inventive concept is here, if inventive concept is 102, 103 analysis, because Mayo does say, they overlap a bit. In this case, I have an expert who, in addition to the statements in the patent, explained to the court the novelty. It's not anticipated, the non-obviousness. Explained that he was in the industry at the time, and there was nothing that existed at the time, anything like this. I mean, again, this company was created because there were companies out there. Here's my problem with that. I mean, we're talking about sub 2 now, so we're assuming this is directed to an abstract idea. I know you disagree with it. But, and this is where I have a really hard time finding the line. If you have an abstract idea, and you do it on a computer, it's not eligible. You have an abstract idea that involves multiple computers, because that's the whole point. But how does that make it eligible? I mean, a lot of these cases we've had, where there's abstract ideas done on a computer we found ineligible, were maybe the first time anybody ever tried to put that abstract idea on the computer. Maybe it was really useful, because without computing speed and modern computers, you couldn't do it by paper or hand. You could think of it, but you couldn't do it. Why isn't this case exactly the same thing? It's an abstract idea of doing a bunch of different tasks in a really efficient way, and maybe you couldn't do it with a mainframe or you couldn't do it with one computer, but you put a bunch of computers together, and you can now do it by the virtue of having a bunch of computing power. The way I would answer that, Judge Hughes, is it's not just putting a bunch of computers together. It's the fabric, it's the programming that my client invented that's implemented on all those computers. See, but this again, I mean, I don't want to beat a dead horse. This is where I think that we have a problem, and maybe the problem is this didn't used to be required, but maybe now has to be required. You say the programming, but claim one, I know we're on to the next case, but I haven't, and these patents are, none of them are all that much different. They don't have any specifics about the programming. At least to me, that's what gets you out of the in fish world, which is a means plus function claim with a very specific algorithm. You have task handlers, system handlers, very kind of generic ideas, I think. Well, Your Honor, you're talking about the claims specifically, not the disclosure. Okay. The claims, and in this case, for example, the 267 patent. That's at an APPX 0, the claims are at APPX 112. Okay. First, I disagree with, and the record on a 12B6 motion says task handlers, request handlers, and process handler functionality are not generic and weren't there. Can you rephrase that in the declaration where it says it's not generic? I mean, I see where you have, for example, many paragraphs that say SETI at home does not have, and then unless you list all the elements of each of the claims in separate paragraphs. Well, where is there a specific concept you're talking about? If you look at the complaint, and I would take you to page APPX 129 is one example, paragraph 47, no claim of the asserted patent utilizes a generic computer to apply a fundamental economic concept or conventional business practice. No claim of the patent can be performed by humans. The subject matter in each of the claims is directed to limited computers. I mean, it goes through, and this is supported by Dr. Green's declaration. If you look at paragraph 57, computers are capable of processing information in a distributed manner that are not covered by this sort of claim. So there's other ways you can do it, and it brings up the SETI at home. That was a one- All these things you're reading us tell us things that they're not doing. Can you point to us that says this is a specific program that operates in a specific way that is analogous to NFISH? Yes. If you look at page APPX 125, and also in the specification, I would direct you to the specification which talks about overcoming problems, but paragraph 32 of the complaint, to achieve acceptable levels of performance and reliability for mission-critical computing, it talks about the prior, then he said, paragraph 34. Each of the asserted claims is rooted in computing technology in order to overcome these problems, so identifies the problems, he says they overcome the problems, and improves the functionality of computers, and then- All this is saying this is a result. We've invented this new system. It's better than the old system, but it doesn't tell us what the new system is. It doesn't say why. I'm just adding on to what he says. He says it claims a new novel specific and inventive mechanism, system, or method, and it's very general. It doesn't say what specifically is the thing that's inventive. The specification specifically tells you what a request handler is, what a process handler is. Why don't you take us there? Okay. If you look at- If you look at A0238, and this is actually claim one of the patent, of the 209 patent. I'm sorry, this? What? I'm sorry. I'll go to the- Well, we're past the 209 patents. Oh, that's right. Sorry. These are autonomous- Let's go to APPX112. Let's just start with claim one. It specifically talks about, it introduces the request handler, the process handler, the task handler. It says what each is configured to do, which is functionality, and I'll give you the example of column 28, line 30. This is talking about the process handler. In response to state information analysis indicating that a processing task remains for the process flow, and it goes out, so it's receiving state information. That is what is enabling these computers to work together. What's state information? State information is information that's described with respect to the state of the task being performed. It's not simply an on and off state like in general computing terms. It's what's going on with this task. Where are you at in processing this task? It's the status of the task. It's the status of the task, but it's being shared. Again, this is the functionality. This isn't an application program where you plug this in and it does a task. What this does is it receives all these computers working together as one computer, receive an application program, take the task, break it up into smaller tasks, which is in the claims, and then processes that information in the most efficient way based on the resources it has available. The key here is the goal. Remember, the goal was to use commodity boxes, hardware, and enable them to work together to give more power and redundancy. Do you think what you just said is a fair description of the invention? Yes, your honor, I do. Then how is that not abstract? What you just basically said was it divides up tasks, sends them out to be processed in a more efficient manner. The reason it's not is because it's not just a generic computer doing that. This is 50 computers or 20 computers that are doing it. Or two. Two or more, correct, doing it together. The state of the art at the time didn't do that. It didn't. What about the disclosure in columns two and three that say distributed computing was known and that SETI at home or other examples where there were two or more computers that split up tasks among them? That's the prior art, your honor, like the SETI computer. That's where one computer, who they described as command and control, sent out a task and then received back information. The difference is if that SETI computer broke down, the task handlers, the computers that sent it to, would have nobody to send it to. There's no redundancy. The other difference is in the SETI system, if the dependent computer broke down, the SETI master computer didn't have the ability to even know that or to know that it should step in and do that task. Here what was created was a group of computers together that can know constantly what's going on with each other so that if any one of them has to step up and do something, it can do that. And that's described in detail in the flow charts in the specification. It's described in detail in the specification, and we have to look at the written descriptions to know what the claims mean. I mean, if my client was required to claim the computer functionality and all of its detail in a claim, the claim would be four pages long. Where in the specification does it disclose that it's so important that the inventive aspect, or one of the inventive aspects, is the idea of being able to, if one computer falls out, that there will be intelligence to know that. Right. Well, first it introduces the problem and talks about that's the problem, that if one computer falls out. And then within the specification, it talks about exchanging state information. It also talks about primary and secondary computers. So you can assign a task to two computers. One's a primary and one's just monitoring as a secondary in case it falls out. There's a discussion of that in the specification as well. Mr. Simon, why don't we save the rest of your time and hear from Mr. Fish. Thank you, Your Honor. Thank you, Your Honors. May it please the Court once again. A lot of what we just heard about the description of that system, nearly all of it, none of it's found in the claim language. And that's obviously what we have to work with. And Judge Hughes, I'd like to follow up on your questions that seem very BASCM-related, coming back to that once more. As Your Honor knows, the BASCM decision itself calls it a close call. And I don't even think that the apestry claims are close enough to be a close enough close call. That what we've got here, as we've heard, is something that is not unconventional. Column two of the specification identifies that Unix clusters and Unix servers and Unix network computers operated together as well. That's exactly what we've just heard, two computers networked together. Conventional hardware, conventional network. This is not the condition of BASCM, where someone is moving the filtering device to a different location, separate from where the prior art was, separate from where the general view of how it should operate functioned. There's nothing unconventional about what we've just heard described. And so in that respect, I don't think that BASCM is a safe harbor at all. In fact, we're back to the other cases we've talked about before, where we've got general purpose computers trying to implement nothing more than abstract concepts. And so in that respect, these claims do not meet the BASCM test. Unless there are any other questions, I ask that this Court affirm the two decisions of the lower court. Thank you, Mr. Fish. Mr. Simon has a few minutes if he needs it for rebuttal. Yes, Your Honor. I was able to locate now additional allegations in the complaint at APPX 135 and 136, where it specifically discusses the SETI at-home computer and how the new system is better than that and why. And it starts at APPX 135 through 138. What I'd like to end with is, in this case, the district court on a judgment on the pleadings made factual findings that say what we're doing is routine and conventional. Didn't cite anything to the record and instead was really caught up in the fact that we use commodity or generic computers to make the invention. What's missed there is, that's the whole purpose of the invention, to use generic computers and imbue them with the capability to work together in a seamless fashion so that a PC or a small computer was able to provide the power that a big computer would have. In addition, if you had a Unix computer and the things that were in the past and distributed supercomputers, you still had to employ programmers who could be able to do it. In this case, the district court found routine and conventional and the second district court case, the first one found routine and conventional. The second one said we're performing generic computer functions using generic computers. The evidence was undisputed that, as alleged in the complaint, a specific single generic computer couldn't do it on its own. When we combine all these computers together, it still wouldn't work unless you make each of those computers be able to work together in a seamless way so that they can divide up the tasks, know who's doing what tasks, and group it all back together. That's discussed in the specification. It's improper for the district court looking at the specification to make findings contrary to the specification at the 12B stage. It's improper for the district court to ignore the declaration of the expert where he goes through and explains why this is inventive and what didn't exist at the time. There just simply wasn't a system back in 2002 that did this with generic computers, with commodity computers. The last thing I'd say is that the district court didn't even cite to or that specifically discussed if you take software on a new computer, imbue it with new functionality, that's not an abstract idea. If it is, it can be inventive. What I'd suggest in this case is at the 12B6 stage, the fact that there's no evidence of record that does what my client claims in the patent and discloses in the patent, that it's improper to dismiss the case on that basis. Thank you. Thank you, Mr. Simon. We'll take the case on revisement.